**In the United States District Court
for the District of Kansas**

---

Case No. 24-cv-02135-TC-BGS

---

DIVOT BOARD, LLC,

*Plaintiff and Counter-Defendant*

v.

GOLF TECHNOLOGIES, LLC, D/B/A
BIRDIE BATH

*Defendant and Counter-Claimant*

---

# MEMORANDUM AND ORDER

Plaintiff and counter-defendant Divot Board, LLC filed suit, alleging that defendant and counter-claimant Golf Technologies, LLC d/b/a Birdie Bath has infringed its patent, U.S. Patent Number 10,639,539 ("the '539 Patent"). Doc. 1 at ¶ 1.[1] The parties have requested that two terms in the '539 Patent be construed as a matter of law under *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). Docs. 34, 37, 38. For the following reasons, the terms are defined as follows:

| | |
|---|---|
| Anchors | An element designed to hold an object in place. |
| Mounting spikes | A downward projection tapered to a pointed or rounded end. |

[1] All document citations are to the document and page number assigned in the CM/ECF system.

# I

## A

The Constitution empowers Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. Pursuant to that authority, Congress enacted the Patent Act, 35 U.S.C. §§ 1 *et seq*., which directs the U.S. Patent and Trademark Office to examine applications and issue patents that grant the patentee the right to exclude others from making, using, offering for sale, or selling the patented invention. *See* 35 U.S.C. §§ 131, 154, 271.

A patent must describe the scope of an invention to "secure to [the patentee] all to which he is entitled, [and] to apprise the public of what is still open to them." *Markman*, 517 U.S. at 373 (quotation marks and citation omitted) (alterations in original). This defines the right to exclude. *Id.* To achieve these objectives, a patent document includes two elements: a specification "describing the invention 'in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same,'" and one or more claims which "'particularly poin[t] out and distinctly clai[m] the subject matter which the applicant regards as his invention.'" *Markman*, 517 U.S. at 373 (quoting 35 U.S.C. § 112) (alterations in original).

"The claim 'define[s] the scope of a patent grant.'" *Markman*, 517 U.S. at 373 (quoting 3 E. Lipscomb, Walker on Patents § 11:1, p. 280 (3d ed. 1985)) (alterations in original). The claims serve "to forbid not only exact copies of an invention, but [also] products that go to the heart of an invention but avoid [] the literal language of the claim by making a noncritical change." *Markman,* 517 U.S. at 373-74. (citation and internal quotation marks omitted). When dealing with a patent infringement dispute, the court must determine whether the allegedly infringing product is covered by the patent. *Id.*

The patent infringement inquiry involves two steps, the first of which, claim construction, is at issue here. Claim construction requires that a court must properly construe the asserted claims. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). This is a matter of law to be resolved by a court. *Id.* at 970-71. Second, the properly construed claim must be compared to the accused method or device to determine infringement. *Markman*, 52 F.3d at 976.

The Federal Circuit Court of Appeals provides the guiding methodology for claim construction in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). *Phillips* governs how all district courts construe claims. *See, e.g., Sprint Communications Co. L.P. v. Comcast Cable Communications LLC,* 2014 WL 5089402 at *2 (D. Kan. 2014) ("Claim construction is governed by the methodology set forth by the Federal Circuit Court of Appeals in *Phillips v. AWH.*").

Plainly stated, the claims of the patent define the patented invention. *Phillips,* 415 F.3d at 1312. *Phillips* requires that courts give a claim term its ordinary meaning. *Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.,* 130 F.4th 1372, 1379 (Fed. Cir. 2025) (citing *Phillips,* 415 F.3d at 1312). In a patent setting, ordinary meaning is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips,* 415 F.3d at 1313.

The claim construction inquiry begins with the intrinsic evidence and then, if necessary, moves to the extrinsic evidence. Intrinsic evidence includes both parts of the patent itself, the claims and the specification, as well as the prosecution history. *Phillips,* 415 F.3d at 1313-14. The prosecution history "consists of the complete records of the proceedings before" the Patent and Trademark Office and incorporates prior art, which are preexisting relevant patents. *Phillips,* 415 F.3d at 1317. In cases where the intrinsic evidence does not resolve the dispute, the court may look also to extrinsic evidence to understand claim terms. *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.,* 574 U.S. 318, 331 (2015). Extrinsic evidence includes "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman,* 52 F.3d at 980.

The claim construction inquiry begins with the words of the claims themselves, which "provide substantial guidance as to the meaning of particular claim terms." *Regeneron Pharmaceuticals,* 130 F.4th at 1381 (quoting *Phillips,* 415 F.3d at 1314). In construing one claim, ordinary meaning can be gleaned from both "the context in which a term is used in the asserted claim" as well as "[o]ther claims of the patent in question." *Id.*

The claims do not stand alone, but rather they are part of a "fully integrated written instrument," which consists "principally of a specification that concludes with the claims." *Continental Circuits LLC v. Intel Corporation,* 915 F.3d 788, 796 (Fed. Cir. 2019) (quoting *Phillips*, 415 F.3d at 1315). Claims "must be read in view of the specification."

*Phillips,* 415 F.3d at 1315 (quoting *Markman,* 52 F.3d at 978). Intrinsic evidence from the specification is "always highly relevant to the claim construction analysis" and serves as "the single best guide to the meaning of a disputed term." *Id.* at 1315 (internal quotations omitted). A specification may contain "a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess," in which case the patentee's definition controls. *Phillips*, 415 F.3d at 1316. Or the specification "may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Continental Circuits LLC,* 915 F.3d at 796 (quoting *Phillips*, 415 F.3d at 1316).

The final piece of intrinsic evidence, prosecution history, is also frequently informative, although less so than the specification. *Markman*, 52 F.3d at 980; *Phillips,* 415 F.3d at 1317. The prosecution history is the "complete record of the proceedings before the U.S. Patent and Trademark Office[ ], providing evidence of how [it] and the inventor understood the patent." *Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1373 n.7 (Fed. Cir. 2019) (cleaned up). It also includes prior art that was referenced during patent prosecution. *Barrette Outdoor Living, Inc. v. Fortress Iron, LP,* 156 F.4th 1353, 1363 (Fed. Cir. 2025). Prosecution history "provides evidence of how the PTO and the inventor understood the patent." *Phillips,* 415 F.3d at 1317. Prosecution history is principally illuminating in showing "whether the inventor limited the invention" during prosecution, narrowing the scope of the claim terms beyond their facial language. *AIA Engineering Ltd. v. Magotteaux Int'l. S/A,* 657 F.3d 1264, 1272 (Fed. Cir. 2011) (quoting *Phillips,* 415 F.3d at 1317).

While the Federal Circuit has made clear that intrinsic evidence takes clear precedence in claim construction, extrinsic evidence, which includes expert testimony, treatises, and dictionaries, is frequently also relevant. *Phillips,* 415 F.3d at 1317. In particular, expert testimony is useful to "provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of ordinary skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* at 1318. General purpose dictionaries are useful primarily when dealing with claim language readily understandable without specialized skill or knowledge. *Phillips,* 415 F.3d at 1314. In most instances claim meaning is defined relative to "a particular meaning in a field of art" to which dictionary definitions are not applicable. *Id.* When exercising its

discretion to admit and consider extrinsic evidence, a court "should keep in mind the flaws inherent in each type of evidence and assess that evidence accordingly." *Phillips*, 415 F.3d at 1319.

**B**

This patent infringement case involves a golf training aid. Divot Board asserts that Birdie Bath's golf training aid infringes its '539 Patent. *See generally* Doc. 1. Both parties produce and sell a golf training aid that attempts to measure and reflect a golfer's swing path. Each does so by placing multi-colored, reversible discs attached to the top surface of the board or mat that change color when brushed by a golf club. Doc. 37 at 5. Both boards are secured in a frame with a slip-resistant bottom. *Id.* at 5, 8.

The general function of the devices is not at issue. Rather, the mechanics and nature of their respective slip-resistant bottoms are. The bottom surface of Divot Board's device is comprised of anchors to prevent the board from moving during use. Doc. 37 at 5. But the bottom surface of Birdie Bath's device has a grid of protruding columns and rows. Doc. 37 at 8. Divot Board contends this grid is equivalent to elements of the '539 patent.

The '539 patent has a variety of terms that are not in dispute. These include "discs," "frame," "bottom surface," and "attached." Doc. 28 at 1. This Memorandum & Order adopts the parties' proposed constructions for these agreed-upon terms.

Two terms within the '539 patent are in dispute.[2] Doc. 28-1. One is "anchors" and the other is "mounting spikes." Both concern Divot Board's slip-resistant bottom. These disputed terms appear in claim 1 of the '539 Patent, which reads, in relevant part:

> A golf practice board to indicate a club head's path along a ground surface to improve a golfer's swing, the golf club practice board comprising . . . a frame with a bottom surface, wherein the mat is secured within the frame; and a plurality of *anchors* attached to the bottom

---

[2] A status conference was held on January 8, 2026, and the parties agreed to decide claim construction based on their briefs and without a *Markman* hearing. Doc. 46.

> surface of the frame, wherein . . . the plurality of anchors comprise a plurality of *mounting spikes*.

Doc. 37-2 at 9 (emphasis added).

The dispute between the parties on the term anchors is slight. Divot Board argues that the term means "a mechanism to provide stability to an object laying on the ground," but not necessarily fully secure it in one place. Doc. 28-1. Birdie Bath contends the term is instead "an element designed to hold an object in place." *Id.*

The differing construction of the term "mounting spikes" is more pronounced. Divot Board asserts that it means a "downward projection having a pointed, tapered, or rounded end." Doc. 28-1. Birdie Bath, on the other hand, contends it means only "a protrusion tapered to a point intended to pierce a surface." *Id.*

**II**

This dispute concerns two terms described in claim 1 of Divot Board's '539 Patent.[3] Doc. 28; Doc. 28-1. These terms are construed pursuant to the guiding principles of *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). Applying these principles, the terms are defined as follows:

| | |
|---|---|
| Anchors | An element designed to hold an object in place. |
| Mounting spikes | A downward projection tapered to a pointed or rounded end. |

[3] Divot Board made a passing reference to the notion that Birdie Bath's expert would not qualify as a person of ordinary skill in the art under Divot Board's expert's definition, but it failed to add any meaningful substance to that argument. *See* Doc. 37 at 10. As a result, that argument has been waived. *In re Google Technology Holdings, LLC,* 980 F.3d 858, 862 (Fed. Cir. 2020) (noting arguments are waived when parties relinquish or abandon them).

**A**

The parties dispute the construction of the term anchors. Divot Board contends that the anchors merely stabilize the board, which allows for slight movement of the mat during use. *See* Doc. 37 at 11–12. Birdie Bath, however, contends that the anchors are designed to hold the board in place. *See* Doc. 34 at 12. Thus, their dispute centers entirely on how firmly anchors secure the training aid to the surface on which it lays. Based on the specification, prosecution history, and extrinsic definitions, Birdie Bath's proposed construction is adopted and the term "anchors" is defined as "an element designed to hold an object in place."

**1**

When construing a claim, federal district courts begin with intrinsic evidence. Intrinsic evidence entails the patent itself, including both claim and specification, as well as the prosecution history. *Phillips,* 415 F.3d at 1314.

**a**

The first component of the intrinsic evidence to look to is always the claim. *Id.* In this case, the claim describes only "a plurality of anchors attached to the bottom surface of the frame." Doc. 37-2 at 9. That does not resolve the parties' dispute as it does not define the term anchors. *Phillips,* 415 F.3d at 1315 (noting courts must nearly always look beyond the claims to the specification to understand claim terms).

**b**

Next, courts must consider the specification when discerning the meaning of a term. A patent's specification can limit the apparent breadth of a claim term where the patentee "reveal[s] a special definition . . . that differs from the meaning it would otherwise possess" and where the patentee has intentionally disclaimed or disavowed the claim scope. *Phillips*, 415 F.3d at 1316.

The usage of anchors within the specification, as Birdie Bath asserts, suggests the term entails holding the product securely. Although the term "anchors" is used several times in the specification, two are especially illuminating. *See* Doc. 37-2. In one, the specification states that "the anchors [are] designed to help secure the practice board to a

ground surface." Doc. 37-2 at 8. In another, it states that "any anchors suitable for anchoring the board to a carpet, grass, or other ground surface may be used." Doc. 37-2 at 9. In other words, these usages indicate the anchors are designed to secure the training aid on certain horizontal surfaces. The parties appear to accept that functionality. *See* Doc. 34 at 13; Doc. 37 at 12.

Divot Board argues for a more expansive reading of the specification. Both parties agree that the anchors are at least stabilizing, but Birdie Bath asserts they must hold firmly, while Divot Board argues they need only "provide stability." *See* Doc. 34 at 9-11; Doc. 37 at 12-13. Divot Board's broader construction is not supported by anything in the specification. And without a clear indication, the specification cannot be used to either limit or broaden claim terms. *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333–34 (Fed. Cir. 2007) (citing *Phillips*, 415 F.3d at 1323).

The specification language reinforces the more limited construction. The specification notes that "the anchors [are] designed to help secure the practice board to a ground surface." Doc. 37-2 at 8. The specification does not further define "secure," and the term does not appear within the claims. But, in common usage, these words used in the specification are not difficult to comprehend. The verb "secure" means "to make fast" or to "hold fast." *Secure*, Merriam-Webster, https://www.merriam-webster.com/dictionary/secure. "Fast" in this context means "firmly fixed." *Fast*, Merriam-Webster, https://www.merriam-webster.com/dictionary/fast. Neither party points to "secure" being a term of art. These definitions undermine the broader functionality construction offered by Divot Board. Secure is itself defined as "holding fast," which is synonymous with Birdie Bath's construction of the anchors as "designed to hold an object in place." Doc. 34 at 9.

Divot Board and their expert argue that the anchors only "help secure" but do not fully secure the product. Doc. 37 at 9; Doc. 37-9 at 18. It asserts this means that the anchors are only partially responsible for securing and thus do not themselves hold the product firmly in place. *Id.* As Birdie Bath points out, however, nothing else in the patent serves to hold or secure it. Doc. 34 at 14. Additionally, that the anchors help secure does not change the underlying definition of secure as holding fast. As such, the inclusion of "help" does not reduce the specification's support of Birdie Bath's conclusion.

**c**

The prosecution history is also an important component of intrinsic evidence, as it can provide additional guidance as to the meaning of disputed terms. Prosecution history typically documents the duration of the patent process, containing both the back-and-forth communications between the patentee and the patent examiner, and the resulting amendments made to the patent language. *Phillips,* 415 F.3d at 1317. This history can illuminate the patentee and examiner's understandings of patent terms. It can also, where language was rejected or added based on patentability, expand upon and limit the claim language in the final patent. *Id.*

Considering the prosecution history of the '539 Patent undermines Divot Board's construction. *Contra* Doc. 37 at 13.[4] Robert Longo, the patentee of the '539 Patent and Divot Board's founder, originally filed a non-provisional patent application with the USPTO bearing U.S. App. No. 16/299,477 ('477 Application). Doc. 37 at 5.

Claims three and four from the '477 Application are relevant to this dispute. Claim three provides: "The golf practice board of claim 2, further comprising a plurality of anchors attached to the bottom surface of the frame." Doc. 37-3 at ¶ 3. Claim four provides: "The golf practice board of claim 3, wherein the plurality of anchors comprise a plurality of mounting spikes." Doc. 37-3 at ¶ 4. Claim three constitutes the disputed term "anchors" and claim four the disputed term "mounting spikes," both of which were ultimately combined into claim one of the '539 Patent at issue here. Doc. 37-2 at 9. As a result, both claims

---

[4] Birdie Bath invokes the doctrine of prosecution history estoppel to argue that Divot Board cannot propose certain claim constructions based on the prosecution history. Doc. 34 at 10. Prosecution history estoppel applies only during infringement analysis. *Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1322 (Fed. Cir. 2013). At the claim construction stage, a related doctrine, prosecution disclaimer, applies instead. *Id.* (noting prosecution disclaimer applies "where an applicant's actions during prosecution prospectively narrow the literal scope of an otherwise more expansive claim limitation.").

from the '477 Application inform the ultimate understanding of the term "anchors" in the '539 Patent.

The '477 Application was initially rejected in part by the patent examiner. Doc. 37-4 at 3. This rejection limits term construction in the final '539 Patent. In particular, the examiner rejected claim three as obvious. *Id.* at 6. The examiner read the proposed claim three to "broadly call[] for 'anchors' without any further structure." Doc. 37-4 at 6, ¶ 11. The examiner then read this broad definition to include items such as hooks and double-sided tape. *Id.* Having defined "anchors" thus, the examiner found that "anchors," as used to "mount [] for display," was obvious in light of a prior patent. *See* Doc. 37-4 at 6, ¶ 11. This means that claim three of the '477 Application was unpatentable without rewriting. Because this broad initial version of the anchor claim was rejected, this original, broad reading that Divot Board proposes cannot be transferred to the terms of the finalized patent. *Trading Techs. Int'l, Inc.*, 728 F.3d at 1322.

The examiner also correspondingly rejected claim four because it was dependent on the unpatentable subject matter of the other claims. Doc. 37-4 at 8. This means that nothing about claim four was intrinsically unpatentable. The examiner noted that claim four "would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims." Doc. 37-4 at 8, ¶ 16. As a result, claim four had no inherent substantive flaws during prosecution. *See also* Part II.B., *infra*.

Based on examiner's rejection of claim three, Longo, the patentee, combined the prior claims into the single amended claim at issue in this dispute and connected them with a "wherein" clause. Doc. 37-7 at 3. The Federal Circuit has recognized that "wherein" clauses can be used to limit the breadth of claims. *Allergan,* 935 F.3d at 1374. This is especially true if its usage was a condition to patentability. *Id.* at 1376 (quoting *Hoffer v. Microsoft Corp.,* 405 F.3d 1326, 1329 (Fed. Cir. 2005)); *see also* Manual of Patent Examining Procedure 2111.04 ("the determination of whether each of these clauses [wherein or whereby] is a limitation in a claim depends on the specific facts of the case.").

The prosecution history shows that the wherein clause in Claim 1 of the '539 Patent was material. This means that the second part of the clause, "mounting spikes," limits the first part of the clause, "anchors." Doc. 37-7 at 3. In other words, the record confirms that Divot Board, the patentee, adopted the "wherein" structure in the finalized patent in

response to the examiner's rejection of claim three of the '477 Application. Doc. 37-7 at 3. Consequently, claim four, "mounting spikes," inherently informs the understanding of claim three, "anchors." Doc. 37-7 at 3.

That prosecution history precludes Divot Board's broad reading of anchors. Specifically, Divot Board disclaimed the original, broad un-derstanding of anchors originally proposed in Claim 3 of the '477 Ap-plication by relying on the mounting spikes amendment. Doc. 37-4 at 6, ¶ 11. At the claim construction stage, this prior prosecution dis-claimer precludes Divot Board's attempt to revive that disclaimed construction. *Teleflex, Inc. v. Ficosa North America Corp.,* 299 F.3d 1313, 1327 (Fed. Cir. 2002) (holding that when a patentee disavows interpretations during patent examination, prosecution disclaimer applies). And, as a consequence, the word anchors must be read as excluding "hooks and double sided tape" and other broad interpretations that Divot Board now seeks. *See Chimie v. PPG Indus.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim.") (quotation marks and citation omitted). The prosecution history suggests that the term anchors means to "hold an object in place," which is in line with the understanding of the patent following its amendments.

**2**

Given the lack of express definition, the next source of meaning comes from the extrinsic evidence. Extrinsic evidence here includes expert testimony as well as dictionary definitions. *Markman,* 52 F.3d at 980. That, too, confirms a narrower construction of the term anchors.

**a**

The expert testimony provided is largely unhelpful. Divot Board's expert, Stephen Eisenberg, suggests the term "anchors" has a specific meaning "in the golf product manufacturing and design industry," and this meaning is "a mechanism to provide stability to an object laying on the ground". Doc. 37-9 at 15-16. The basis for his contention, he says, is the nature of golf swing training aids, which functionally desire not to affix too firmly to the ground so as to avoid being "shocking to the hands of the user." *Id.* But this definition runs headlong into the specification, which notes that "the anchors [are]

designed to help secure the practice board to a ground surface." Doc. 37-2 at 8. The verbiage of secure from the specification denotes a stronger anchoring force than Eisenberg's suggestion of stability, and the specification takes precedence over extrinsic evidence. *Phillips,* 415 F.3d at 1315. Birdie Bath's expert, Derick Schweppe, says little other than that the definition of "anchors" corresponds with Birdie Bath's proposed construction. Doc. 34-2 at 5. In other words, neither expert suggests an ordinary meaning in the eyes of a person skilled in the art that is consistent with "the context of the specific patent claim under review." *Teva Pharmaceuticals,* 574 U.S. at 332 (noting also that while expert testimony can be considered, it "cannot be used to prove "the proper or legal construction of any instrument of writing." (quoting *Winans v. New York & Erie R. Co.,* 62 U.S. 88, 100-101 (1859)).

**b**

That impasse among expert testimony makes it useful to consult a dictionary. Dictionaries are used "to affix a legal definition at least somewhat more precise than an intuitive understanding." *See Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1350 (Fed. Cir. 2004), *rev'd on other grounds by* 546 U.S. 394 (2006) (concluding that it was proper for the district court to conclude that the patentee did not act as his own lexicographer before consulting a dictionary to affix a more precise legal definition to the intuitive understanding of a color); *see also Bancorp Servs., LLC v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1372 (Fed. Cir. 2004) (giving the term its plain and customary meaning where the patentee coined a term that had no ordinary and customary meanings in the art, but did not directly define the term). Courts may "rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996); *accord 3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1321 (Fed. Cir. 2013) (same).

The narrower construction of the term anchor—to hold the board in place—aligns more closely with the dictionary definition for anchor. An anchor when used as a noun is defined as "something that serves to hold an object firmly." *Anchor*, Merriam-Webster, https://www.merriam-webster.com/dictionary/anchor (last visited May 19, 2026). Based on this understanding, a person of ordinary skill in the art would understand anchors according to the dictionary

definition supplying the plain meaning construction. *See Unitherm Food Sys.*, 375 F.3d at 1351 (affirming district court's decision to use the dictionary to define the term and then adopt a plain meaning construction of that term because it "did not contradict any definition that one of ordinary skill in the art could ascertain from the intrinsic evidence in the record").

Divot Board opposes this conclusion. *See* Doc. 37 at 8–11. It asserts that this definition necessarily requires that the anchors hold the board in a "single, fixed position without movement" and require a jury instruction on what it means to hold. Doc. 37 at 11. But the more limited construction does not suggest a specific degree of anchoring force. Holding does not, and as a matter of reality cannot, require no movement. As Schweppe noted, holding still permits that "some movement could occur" as part of its ordinary meaning. Doc. 37-10 at 5.

This construction will not cause confusion. *Contra* Doc. 37 at 8-11. "Hold" is a core part of the ordinary, general purpose dictionary definition of anchor. *Anchor*, Merriam-Webster, https://www.merriam-webster.com/dictionary/anchor (last visited May 19, 2026). That means it is comprehensible and useful in this context. *Free Motion Fitness, Inc. v. Cybex Intern., Inc.,* 423 F.3d 1343, 1348-49 (Fed. Cir. 2005) (noting that dictionaries can be used in the context of the claim to find "the most appropriate definition."). This dictionary definition also aligns with the specification and prosecution history, wherein the anchors' primary role is "secur[ing]" the mat to the ground. Doc. 37-2 at 8.

* * *

Both the intrinsic and extrinsic evidence support a narrow construction. As a result, the term anchors is construed as "an element designed to hold an object in place."

**B**

The parties also dispute the construction for the term "mounting spikes."[5] Birdie Bath contends that mounting spikes must both have a pointed end and pierce a surface. Doc. 34 at 12. Divot Board, however, contends that mounting spikes can have pointed or rounded ends, and that the spikes need not be piercing. Doc. 37 at 11-12. Thus, their dispute concerns the shape of the mounting spikes' ends and their purpose. Based on the specification, prosecution history, and extrinsic evidence, "mounting spikes" is defined as a "downward projection tapered to a pointed or rounded end."

**1**

The parties dispute the purpose of mounting spikes. Birdie Bath argues the purpose of the spikes is to pierce the surface they rest on. Doc. 34 at 16. Divot Board argues that piercing is an unsupported, overly narrow limitation on construction. Doc. 37 at 15. As neither the intrinsic nor extrinsic evidence supports such a limitation, mounting spikes is construed not to require piercing.

**a**

As noted, when construing a claim, the intrinsic evidence is the first step. *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1218 (Fed. Cir. 2014). This includes an evaluation of the claim, its specification, the prosecution history, and a dictionary, if appropriate.

**i**

The claim does not resolve the parties' dispute regarding the purpose of mounting spikes. The disputed term appears in claim one of the '539 Patent, which reads, in relevant part that "the plurality of anchors comprise a plurality of *mounting spikes*." Doc. 37-2 at 9 (emphasis added). The claim does not answer whether the patentee intended for the mounting spikes to pierce a surface. Rather, the claim language

---

[5] While the term includes two words, the adjective "mounting" modifies the noun "spikes." *See, e.g.*, *Weyerhaeuser Co. v. United States Fish & Wildlife Serv.*, 586 U.S. 9, 19 (2018) (treating the adjective "critical" as modifying the noun "habitat"); *see also Sound View Innovations, LLC v. Hulu, LLC*, 166 F.4th 958, 965 (Fed. Cir. 2026) (describing how an adjective in a claim term modifies a noun in a claim term to resolve a claim construction dispute).

merely describes mounting spikes as a type of anchor. The claim language only makes clear that the individual term "spikes" does not inherently include mounting attributes, as the inclusion of the modifier "mounting" signifies. *Phillips,* 415 F.3d at 1314.

**ii**

The specification confirms that the mounting spikes' purpose is to hold the training aid in place, not to pierce the surface on which it sits. The specification of the '539 Patent reveals three things about mounting spikes in particular. First, that the spikes create a plurality of anchors. Doc. 37-2 at 9. Second, that the spikes "extend[ ] outwardly from the bottom surface of the frame." Doc. 37-2 at 9. Third, that mounting spikes "may be integrated into the construction of the frame." Doc. 37-2 at 9. It further states that anchors, which includes mounting spikes, are used for "carpet, grass, or other ground surface[s]." Doc. 37-2 at 8. This usage, likewise, does not suggest a requirement of piercing. *See Free Motion Fitness, Inc. v. Cybex Int'l*, 423 F.3d 1343, 1350 (Fed. Cir. 2005) (rejecting the argument that the patentee intended to limit the article to the singular even though the specification described a single cable instead of just a cable).

Nor do the specification's drawings suggest a piercing limitation. Birdie Bath argues that the figures of the '539 Patent "clearly show a tapered, pointed element which is shown to pierce or penetrate a ground surface." Doc. 34 at 17. That is not how drawings are used. Absent clear indication that the patentee intended to limit the claim term mounting spikes in this way, "a preferred embodiment described in the specification—even if it is the only embodiment" cannot limit a claim term. *Epos Techs. Ltd. V. Pegasus Technologies Ltd.*, 766 F.3d 1338, 1341 (Fed. Cir. 2014) (quoting *Liebel-Flarsheim v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004)). In fact, the specification suggests that the patentee did not intend to limit the claim term mounting spikes to the embodiments set forth in the patent. Doc. 34-1 at 8 ("[I]t will be clear and apparent to [a person of ordinary skill in the art] that the invention is not limited to the embodiments set forth and that the invention can be adapted for any of several applications.").

**iii**

The prosecution history precludes a requirement that the mounting spikes pierce the surface on which the training aid sits. During prosecution, the examiner considered but rejected analogizing

mounting spikes to nails used to mount pictures to a wall. Doc. 37-4 at 8. Instead, the examiner found that spikes, as used to secure the product to a ground surface, which is a distinct form and purpose from nails, would be acceptable as a patentable claim. *Id.* Consequently, the prosecution history does not support a piercing limitation.

**b**

Turning to the extrinsic evidence, neither the expert evidence nor dictionary definitions suggest mounting spikes require piercing. The specification states that anchors are used for "carpet, grass, or other ground surface[s]." Doc. 37-2 at 8. This preferred use is reinforced by the shared understanding of both Birdie Bath and Divot Board's experts that the products will often be used on grass or turf. Doc. 37-10 at 10; Doc. 37-9 at 20-23. A usage that allows for anchoring on diverse surfaces—carpet and grass—that are typically not meant to be pierced.

Any construction of mounting spikes to require surface piercing would be incompatible with the specification's suggested usages. A spike need not pierce the rough surface of carpet or grass in order to "secure" the product "to a ground surface." Doc. 37-2 at 8. Expert evidence suggests that golf technology does not generally aim to damage grass. Doc. 37-9 at 20-21. On that assumption, there is nothing to suggest putting a hole in carpet was intended either. *See Pierce*, Merriam-Webster, https://www.merriam-webster.com/dictionary/pierce (defining pierce to include "mak[ing] a hole through" and "to force or make a way into or through"). Limiting mounting spikes to only those that pierce the surface on which the training aid rests runs contrary to what expert evidence suggests a person of ordinary skill would see as the role of mounting spikes. Doc. 37-9 at 20-21.

Although Schweppe facially disagrees, his functional understanding of the mounting spikes actually supports this conclusion. He suggested that the "spikes are meant to embed themselves into th[e] [ground] surface in order to create . . . that secure bond." Doc. 37-10 at 8. He further suggested his definition of pierce did not require perforation, and that holes were in fact not desirable. *Id.* at 10. Instead, he suggested that the spikes in fact pierce carpet or grass when "spreading those fibers apart" and "pushing blades one way or the other." *Id.* This understanding is functionally consistent with an ordinary understanding of how the spikes rest within grass or carpet. This understanding, however, does not entail piercing, as there is neither perforation nor

forcible entry. Doc. 37-10 at 10 (noting the spikes "embed" themselves without "permanent[] damage").

* * *

The intrinsic and extrinsic evidence are in accord. Neither supports a limitation that the spikes pierce the surface.

**2**

The parties also dispute the shape of mounting spikes. While both parties agree that mounting spikes can be tapered and pointed, the parties dispute whether mounting spikes can also be rounded. *Compare* Doc. 37 at 14 (Divot Board describing mounting spikes as "[a] downward projection having a *pointed, tapered*, or rounded end") (emphasis added); *with* Doc. 34 at 15 (Birdie Bath instead describing them as "a protrusion *tapered to a point*.") (emphasis added). Neither intrinsic nor extrinsic evidence supports a limitation to just pointed spikes.

**a**

Again, the first step is to consider intrinsic evidence. *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1218 (Fed. Cir. 2014). This includes an evaluation of the claim, its specification, and the prosecution history.

**i**

The dispute centers on the shape of the end of the spikes.[6] Neither the claims nor the specification shed any light on the shape of the mounting spikes ends. Neither makes any mention of the physical shape or features of mounting spikes. The specification's drawings show a pointed spike end, but, as already discussed, those are only one embodiment of possible mounting spikes. *See* Part B.1.a.ii., *supra*.

[6] The parties use the term "tapered" in different ways and nothing in the specification or prosecution history provides guidance on the term "taper." The ordinary meaning of taper suggests that it describes the shape of the spike itself and not a type of end. *Taper*, Merriam-Webster, https://www.merriam-webster.com/dictionary/taper (defining taper as "to become progressively smaller toward one end."). For purposes of this Memorandum and Order, that definition and conception controls.

Similarly, the prosecution history does not suggest any particular shape for mounting spikes. In its discussion of the relevant claim, prosecution history only suggests mounting spikes are not limited solely to pointed components like "nails" because of their broader role in securing the board to the ground. Doc. 37-4 at 8. This rejection of a possible limitation provides no suggestion of term meaning.

**ii**

When the intrinsic evidence does not clarify the shape of the spikes, extrinsic evidence can provide ordinary meaning. *Free Motion Fitness, Inc.,* 423 F.3d at 1349. This includes both dictionaries and expert testimony.

A person of ordinary skill in the art would understand the term mounting spikes in light of golf spikes and their attributes. Divot Board's expert, Eisenberg, states that a person of ordinary skill in the art would have understood mounting spikes to mean "a downward projection having a pointed, tapered, or *rounded* end." Doc. 37-9 at 20 (emphasis added). Notably, Birdie Bath's expert, Schweppe, partially agreed with that characterization. He defined mounting spikes as inclusive of rounded and blunt points as long as they were tapered along the way. Doc. 37-10 at 11 ("[T]he point could be blunted. It could be very sharp"). Thus, both sides' experts agree on some level that the spikes can be sharp or blunt. *See Id.*

Additionally, both experts agree a person skilled in the art would likely be aware of the historical understanding of golf spikes as a term of art in the field. Doc. 37-9 at 8; *see also* Doc. 34-2 at 10-11. Neither side suggests there is a golf industry meaning of the term mounting, or its association with spikes. *Id.* Eisenberg relies on the evolution of spikes for golf shoes for defining the term. *See* Doc. 37-9 at 20–22. While golf spikes were once sharp and metal, they have long since become "soft spikes," made of plastic or rubber, that serve to provide traction but do not pierce the grass surface itself.[7] Doc. 37-9 at 20. These encompass a range of spike patterns, sizes, and shapes. *Id.* While Schweppe disagrees on whether golf spikes pierce the ground, he also acknowledges that there is a "common definition of 'spikes' in the

[7] Understanding mounting spikes to not be inherently sharp or pointed goes hand-in-hand with the conclusion that mounting spikes do not pierce a surface

sporting goods industry" as certain types of shoes to be used on grass and turf. Doc. 34-2 at 11.

While the specification partially distinguishes mounting spikes from golf cleats, it does not suggest they fundamentally differ. *See* Doc. 37-2 at 9 ("In embodiments, these mounting spikes may be integrated into the construction of the frame. Alternatively, other suitable anchors, such as golf cleats, may be attached to the bottom surface of the frame."). The specification treats them as functionally similar, categorizing both as "suitable anchors." Doc. 37-2 at 9. This distinction does not, therefore, limit their shared textual understandings and attributes. *Cf. Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1326 (Fed. Cir. 2023) (reversing reliance on expert testimony that was "clearly at odds with the intrinsic evidence").

The wording of the specification indicates that the difference between mounting spikes and golf cleats is not necessarily their structure but their method of attachment. The specification notes "mounting spikes may be *integrated* into the construction of the frame" whereas golf cleats "may be *attached* to the bottom surface." Doc. 37-2 at 9 (emphasis added). Thus, nothing in the specification indicates mounting spikes and golf cleats must have different point shapes, even if they might physically differ in layout, size, and material. Consequently, the experts' understanding of spikes can still inform the construction of mounting spikes.

The definition of the word "spikes" does not change this result. It is true that the dictionary defines a "spike" as "a narrow, thin shape with a sharp point at one end, or something, . . . with this shape." But that definition is not dispositive. *Spike*, Cambridge Online Dictionary, https://dictionary.cambridge.org/dictionary/english/spike (last visited May 19, 2026). But that definition is not dispositive: General purpose dictionaries need only be considered when the phrase lacks "a particular meaning in a field of art" and there is no specific understanding of the term by those ordinarily skilled in the art. *Phillips*, 415 F.3d at 1314. Where the expert evidence suggests a shared particular context to spikes in the field of art, ordinary meaning cannot be determined primarily from dictionary definition. *Phillips*, 415 F.3d at 1314. In this case, both experts cite to a particular understanding of spikes in the field of golf technology, and thus the dictionary is not dispositive. Doc. 37-9 at 8; *see also* Doc. 34-2 at 10-11. Accordingly, the term mounting spikes is construed as follows: a downward projection tapered to a pointed or rounded end.

## III

For the foregoing reasons, the disputed terms of the '539 patent are construed as set forth in this Order.

| | |
|---|---|
| Anchors | An element designed to hold an object in place. |
| Mounting spikes | A downward projection tapered to a pointed or rounded end. |

It is so ordered.

Date: September 28, 2026

s/ Toby Crouse
Toby Crouse
United States District Judge